easily distinguishable from the Arvenz case in that it is based squarely on the statute requiring a municipality to keep the streets in repair and free from nuisance, and not upon the negligence of the agents and servants of the city while in the act of making repairs and improvements to a street.

For the reasons above stated, the demurrer is sustained.

Common Pleas Court of Hamilton County.

IN THE MATTER OF MOSSIE JARRELL.*

Decided June 28, 1930.

---

* No appeal or error proceedings were taken from the above decision.

*William Thorndyke,* and *Ralph Becker,* for petitioner.
*John D. Ellis,* city solicitor, *James O'Donnell,* assistant city solicitor, and *Robert G. McIntosh,* assistant city solicitor, for respondent.

BELL, J.

This being an action in habeas corpus, the ultimate question to be determined is whether or not one Mossie Jarrell is illegally restrained and deprived of her liberty.

The writ was issued to Anthony M. Sauer, superintendent of the workhouse of the city of Cincinnati, to show by what authority the said Mossie Jarrell was restrained and deprived of her liberty. No answer was filed but by agreement of counsel the cause proceeded to trial as though an answer had been filed setting forth an order to quarantine the said Mossie Jarrell as being suspected of having a venereal disease.

The evidence disclosed substantially these facts: Mossie Farrell was a married woman living with her husband in this city. At the time the police officers took her into custody and sent her to quarantine, she was in her own house with her husband, there being also a woman present claimed to be a common prostitute by counsel for the respondent. There is no claim that Mossie Jarrell was a prostitute, it being an admitted fact in the case that she was never arrested before in her life and has no police record of any kind. It is further admitted that within a year of the date of her incarceration Mossie Jarrell was infected with a venereal disease, that she went to a public clinic in charge of Dr. Samuel Goldblatt, received certain treatments and was ordered to leave town.

Two police officers of the city of Cincinnati without a warrant and without any information that a felony had been committed, invaded this home at night, took Mossie Jarrell and the other woman and placed them in quarantine, which is located in the same building as the

workhouse in this city. The other woman was released within a few days.

On February 13, 1930, several days after Mossie Jarrell's incarceration, a paper introduced in evidence as Exhibit 2, was addressed to Dr. Peters, city health commissioner, signed by Samuel Goldblatt, clinic physician in charge of the clinic located in the City Workhouse, reading as follows:

"Dear Doctor:
Examination of Mossie Jarrell on February 13, 1930, at the workhouse reveals evidence of being infectious. She is a menace to public health and should in my opinion be quarantined."

On February 18 a letter was addressed to Dr. Goldblatt, Clinic Physician, Workhouse, Cincinnati, offered in evidence as Exhibit 1, reading as follows:

"In accordance with regulation No. 24, Sanitary Code ıf Ohio, adopted by the Ohio State Department of Health, you are directed to quarantine within the confines of the detention hospital for women at the workhouse on Colerain avenue Mossie Jarrell, who is reasonably suspected of being infected with a venereal disease within the meaning of Section 23 of the S. C. of Ohio.
This quarantine order is a measure for the protection of the public health.
You are further directed to exclude from the designated area of quarantine all persons other than the attending physician, dentist or other necessary attendants, except by permission of the health commissioner."

On the 24th day of February the writ was allowed, Mossie Jarrell having remained in quarantine until taken therefrom by the sheriff upon the authority of the writ.

Four questions are presented for determination by the court. Each will be disposed of in the order stated:

1. Was the incarceration illegal?

2. Was any valid order for the incarceration issued by the Health Commissioner of the city of Cincinnati?

3. Were treatments illegally administered to Mossie Jarrell at quarantine.

4. Is Mossie Jarrell suffering from any venereal disease which is infectious within the meaning of the San-

itary Code or the General Code of Ohio?

The right and authority of police officers to make arrests and take persons into custody is found in Sections 13,432-1, General Code. This section provides that "a police officer shall arrest and detain a person found violating a law of this state, or an ordinance of a city or village until a warrant can be obtained."

Except as provided in this section, police officers have no right to make arrests, except that which is granted to any person under Section 13,432-3, which provides:

"When a felony has been committed, or there is reasonable ground to believe that a felony has been committed, any person without a warrant may arrest another whom he has reasonable cause to believe is guilty of the offense, and detain him until a warrant can be obtained."

Section 13,432-3, provides:

"When a peace officer has arrested a person without a warrant, he must without unnecessary delay, take the person arrested before a court or magistrate having jurisdiction of the offense, and must make or cause to be made before such court or magistrate a complaint stating the offense for which the person was arrested."

Section 13,432-5, provides:

"When an arrest is made without a warrant by an officer, he shall inform the person arrested of his authority and cause of the arrest * * * except when a person is engaged in the commission of a criminal offense, it shall not be necessary to inform him of the cause of the arrest."

Summarizing these sections, it may be said that a police officer may arrest any person whom he *finds* violating the laws of the state of Ohio or the ordinances of the city of Cincinnati. He may arrest without a warrant and detain a reasonable time to secure the issuance of a warrant any person whom he has reasonable cause to believe is guilty of the commission of a felony. This presents the further question: Was Mossie Jarrell arrested by these police officers? An arrest in criminal cases is defined as follows by Bouvier:

"An apprehending or detaining of the person in order

to be forthcoming to answer an alleged or suspected crime." (85 Ill., 174; 179 Ill., 150.)

From what has been said, the conclusion is irresistible that Mossie Jarrell was arrested by these two police officers and placed in quarantine, and that such action on their part was without legal authority. Counsel for the city do not attempt to justify the acts of these police officers, but claim that the detention of Mossie Jarrell is not by reason of her arrest but by reason of her being suspected of having an infectious, venereal disease, and in consequence thereof being placed in quarantine by order of the health commissioner of the city of Cincinnati. This makes necessary a decision of the legality of the order of February 18 heretofore referred to as Exhibit 1.

The Legislature of Ohio, by an act passed March 21, 1917, 107 Ohio Laws, 522, Sections 1232 to 1261-43 inclusive, established a State Department of Health, and by Section 1234, a Public Health Council was created; by the next section it is provided:

"That such public health council shall have the power and it shall be its duty to make and amend sanitary regulations, to be of general application throughout the state; such sanitary regulations shall be known as the sanitary code."

By Sections 4404 to 4476, General Code, inclusive, cities are authorized to establish a board of health consisting of five members; Cincinnati, acting under and by authority of these provisions of the statute, created a board of health consisting of five members, and that board, by virtue of the authority granted by Section 4408 appointed William H. Peters Health Commissioner of the city of Cincinnati.

The authority of the health commissioner to place persons in quarantine in cases such as this is found in the sanitary code of the state of Ohio, which was adopted by the Public Health Council of the State Department of Health and became effective on July 1, 1920.

"Regulation 2. The diseases and disabilities herein

named and classified are declared dangerous to the public health, are made notifiable, and the occurrence of cases or suspected cases in Ohio shall be reported as provided in the following regulations: Class 'B'; Chancroid; Gonorrhea; Syphilis.

"Regulation 18: Syphilis, gonorrhea, and chancroid, hereinafter designated venereal diseases, are hereby declared to be contagious, infectious, communicable and dangerous to the public health."

Regulation 19 provides for reports by physicians and others to the health commissioner.

"Regulation 23: The health commissioner of each city and general health district is hereby empowered and directed to make, or cause to be made, such examinations of persons reasonably suspected of having a venereal disease, as may be necessary for carrying out these regulations. Such examinations shall be made only by regularly licensed physicians. All known prostitutes and persons associating with them shall be considered as reasonably suspected of having a venereal disease. Boards of health and health commissioners shall co-operate with the proper officials whose duty it is to enforce laws against prostitution, which is hereby declared to be a prolific source of venereal disease.

"Regulation 24: The health commissioner shall immediately institute measures for the protection of other persons from infection by any venereally diseased person and may quarantine any person who has, or is reasonably suspected of having a venereal disease, whenever in his opinion, quarantine is necessary for the protection of the public health. In establishing quarantine, the health commissioner shall designate and define the limits of the area in which the person known to have, or reasonably suspected of having a venereal disease is to be quarantined and no person other than the attending physician, dentist or necessary attendant shall enter or leave the area of quarantine without the permission of the health commissioner."

By these sections of the Sanitary Code, the health commissioner of a city is authorized to make examination of persons reasonably suspected of having a venereal disease, and if found to be so infected, if the public health requires it, is authorized and empowered to order such persons so infected to be placed in quarantine.

The placing in quarantine of a person, therefore, in-

volves: First, the finding that the person is infected with a venereal disease; second, that the public health requires that such person be quarantined.

The evidence in this case discloses that the health commissioner never saw, examined or found that Mossie Jarrell was infected with a venereal disease, and that he never saw or made the order that she be placed in quarantine. The procedure, as disclosed by the evidence, was that Mossie Jarrell was taken from her home and placed in quarantine, was then examined by a clinic physician, and upon his statement that she "revealed evidence of being infectious" a clerk in the office of the health commissioner made an order that she be quarantined.

The Legislature of Ohio delegated authority to the Public Health Council to pass a sanitary code, and this delegation of legislative authority was sustained by the Supreme Court as being constitutional in the cases of *Ex parte Company and Irwin*, 106 Ohio St., 50.

The sanitary code delegates to the health commissioner authority to quarantine certain persons infected with venereal disease. No authority is found in either the Sanitary or General Code which authorizes the health commissioner of the city of Cincinnati to delegate his power to determine that a person is infected with a venereal disease or to delegate his power to order quarantine. To lawfully order quarantine of a person it is necessary that the health commissioner find that such person is infected and dangerous to public health. The Supreme Court of Ohio, in considering the delegation of authority, under date of April 15, 1930, in deciding the case of *Boeckling Co.* v. *Schwer*, said:

"There is no provision in the law which authorizes the auditor to divest himself of the duty of personally making the appraisement. True, he may call to his aid and assistance experts and clerks, but he may not confer on them or any of them the power to do the things which the law commands the auditor to do."

The reasoning and conclusions reached in that case are pertinent and controlling in the case at bar.

In that case the statute made it the duty of the county auditor to make appraisement of property. He had the

appraisement made by experts and accepted their findings as his own.

From this statement of the law by the Supreme Court, it follows inevitably that the health commissioner of the city of Cincinnati may not delegate the power to find that a person is suffering from a venereal disease, and that the public health requires that one so afflicted shall be quarantined.

The third question presented is as to the legality of the treatment of Mossie Jarrell during her incarceration. A decision of this question is unnecessary and the court refrains from expressing any opinion thereon, except to say that the course of conduct adopted and pursued, as shown by the evidence in this case, is such as should challenge the serious attention and consideration of the authorities of the city of Cincinnati.

As to the fourth question; the evidence discloses that on the 26th of February, two days after the issuance of the writ, Mossie Jarrell was examined by a physician who found that she had no evidence of a venereal disease; it being claimed by Samuel Goldblatt, clinic physician, that she was infected at the time of his examination. No evidence was offered that she was so infected at the time of the hearing. It was claimed, however, that having been quarantined by the health commissioner, the court had no authority to inquire into the question whether or not she was infected with a venereal disease, or that her quarantine was necessary for the protection of public health.

This claim is controlled and disposed of by the conclusion reached by our Supreme Court *In re Remus,* 119 Ohio St., 166.

The court finds that the motion of the police officers in arresting Mossie Jarrell and taking her to quarantine, was illegal and void; that the paper introduced as Exhibit 1 in this case, purporting to be an order to quarantine her was also illegal and void; that Mossie Jarrell is not now infected with a venereal disease; that she was and is illegally restrained of the liberty.

*Writ granted.*